To our spreadsheets and one by one, they withdraw all of the witnesses who were present. The IRS identified certain witnesses that wanted to testify from the bank. You objected, but the whole theory of the case had been disclosed earlier. So then the IRS argues it needs these witnesses to prevail. Well, that's argument, right? It gets to trial when it's its turn. It decides not to call those witnesses. So what is the rest of your argument about? Well, the theory of rigging was actually not disclosed early. It wasn't disclosed until very, very late. It was after the close of discovery that we first learned this. Precisely what do you mean, the theory of rigging? And I see I'm running into my rebuttal time, but I do want to answer the question. We had an analysis. We had an analysis. We had an analysis. So the rate rigging was actually crucial to the finding that the transactions lacked profit potential. And that's the basis on which the court found they lacked economic substance. So this testimony was allegedly going to corroborate the IRS's theory that there was an agreement in advance to rig the rates. And what the court did was assume that these witnesses would have testified exactly as the IRS said they would. But that was after this evidence was before the trial, before the tax court. Was it not about what the spreadsheet showed, both in terms of the banks and your clients? The evidence, Your Honor, if you take out the adverse inference, what the evidence showed is that Deutsche Bank had some spreadsheets in which it applied some rates in pricing the trades. We, our side, had its own spreadsheets in which it applied different rates in pricing the trades. Deutsche Bank sent our side its spreadsheets, which said one thing. We sent back our spreadsheets, which said something else. And I thought your spreadsheets also showed zero. No, in fact, there are spreadsheets we have in the record, in our spreadsheets. There were some spreadsheets that showed zero, and the reason for that had to do with pricing analysis. So that if the market didn't do anything different, there was no gain or loss baked into the transaction. But we also had spreadsheets where the partnerships projected what they expected the actual results of the trades would be. And those showed a profit or loss each time. The other thing I want to emphasize is that the one thing you would expect to see, if the parties agreed in advance on the rate that would apply when the trades were settled, is their actual use of that rate when they settled the trades. And it is undisputed that the partnerships did not use the rate that the court found they agreed to use when it ultimately came time to settle the trades. They used a different rate on their books. But I thought the bank used the same rate. The bank did. And exchanges were going on between the bank and your client. Exchanges, I'm not sure what you mean by that. Well, communications. Emails. The emails at issue were Deutsche Bank sent Delta, my client, spreadsheets showing the use of one rate. And we sent back spreadsheets showing the use of a different rate. To me, that doesn't show an agreement on the rates. It shows the opposite. But did the spreadsheets that your client sent to the bank show zero, even though it was using different rates than the bank? There are some spreadsheets that show zero and some spreadsheets that don't. Could I ask you to address the opening sentences of that paragraph in which the tax court talks about the witnesses who aren't there, the Deutsche Bank witnesses? This is page 1940. Let me just get to it. You said page 1940? 1940. The first sentence is, Mr. Beer's testimony presupposes that Deutsche Bank erred in this way not once, but every time it closed a Delta options trade. Now, when the court says every time, is that meaning every time out of three? Well, the only evidence before the court was about three. Earlier in the decision, the court actually finds that trades that were not at issue here were also rigged. But there was no evidence about that before then. How do you mean there was no evidence? I mean, if Mr. Beer's testimony assumes that Deutsche Bank erred in this way every time it closed a Delta options trade, that seems to encompass the trades in addition to the three. The only evidence we were putting on, Your Honor, Mr. Beer was our witness, and we were talking about the trades at issue, of which there were three. So I agree with you that that's what it says. And what we're saying is that somehow in someone's mind the number got inflated, perhaps because the three block trades were divided up among different partnerships. But it was three times, not dozens the way the government says in their brief, and not thousands as in the Dewey's case, it was three. So you admitted earlier that these other trades were background, right? That's what the court said, that it was allowing prior history of the entities and the partnerships as background to the factual narrative, but not as proof of anything that occurred with respect to these trades. And there was not evidence, nor did the IRS attempt to prove that any of these prior trades were rigged in the way that it alleged that these trades were rigged. The record is just silent on that subject. I'm wondering if this focusing on the allegations of rigging here might be looking at the trees and missing the forest. I mean, the inquiry, the legal inquiry that the tax court had to engage in was to see if there was economic substance to these transactions, right? Whether there was a business purpose other than tax benefit, whether there was a reasonable prospect for gain. What does your argument about rigging and the adverse influence have to do with that larger picture? How does it fit in? Because in the absence of rigging, the transactions had a reasonable prospect for profit. The tax court did not find... A reasonable prospect for profit? And how would that materialize? The profit potential, Your Honor, was in the bet on swings between the krona and the euro. These are pegged rates. Right. What are the chances of them being de-pegged? Intuitively small. In 2001, Your Honor... Well, first of all, a couple of answers to that question. First of all, a couple of weeks before trial, the Swiss franc de-pegged from the euro. These things happen. People make a lot of money and lose a lot of money when they do. I think George Soros made a lot of money having to do with a peg dealing with a pound in 1992. In 2001, the euro was a brand new currency. The krona nearly de-pegged from it right after 9-11, which is around the time when these transactions were occurring. The krona had originally been pegged to the deutschmark. The peg to the euro was a vestigial thing having to do with now the deutschmark was part of the eurozone. It was nowhere near as stable at that time as we think of it now. And there were some known events, and there's documentation in the record it's cited in our brief that Delta had these things in mind. There were some known events that called the peg into question. So it was a long-shot bet, but it was not a completely out of the realm of possibility sort of bet. And this fits with your opening remark, I take it, in the sense that you're arguing that we ought to remand because the evidence doesn't support the basis on which the tax court relied, right? Correct. But you're not precluding that the necessary findings could be made. Right, there were at least two or three other bases on which the IRS challenged these transactions that the tax court did not rule on because it found that they lacked profit potential and therefore lacked economic substance. I'm still – well, I have to ask the IRS counsel, but if the initial sentences of this paragraph are soundly based in the record, then it seems to me the court's reliance on the Deutsche Bank non-witnesses doesn't really amount to anything. He appears to be saying – the tax court appears to be saying the rigging is evident, and that gives the partnerships an enormous incentive to call the Deutsche Bank witnesses to correct that impression. They haven't, so it doesn't look as if that can be corrected. But, I mean, that reading depends upon the ultimate correctness or at least reasonableness of the opening sentences of the paragraph. I guess the only things I would say in response to that, Your Honor, are we didn't actually know who these people were until the IRS listed them on the simultaneously exchanged witness list. And in its brief, the government says, well, we reserve the right to call them. We had a catch-all item that said we reserve the right to call anyone on their witness list. But we didn't know who they were until they were revealed in the witness list. The court denied our eliminate motion because in somewhere in the thousands of pages of documents, their names appeared. But the other thing is that to some extent – I don't think it makes much difference because if the court is correct that the partnership's full acceptance of the data indicates that partnerships were in on the rigging explanation to sound, then it doesn't really matter who the Deutsche Bank witnesses might be. Partnerships have a huge incentive to get somebody from Deutsche Bank to clarify matters and show no, no, that the inference the court has drawn is unsound. Well, I think that concept dovetails to some extent with the burden of proof because – and we argued this below and it's in our briefs as well. We argued, among other things, that under Tax Court Rule 142, because this theory that the reason why the transactions lack profit potential is because the rates were rigged, was not disclosed in the FPOS and, in fact, the IRS didn't even think of it until well after the FPOS. The IRS bore the burden of proof. And the tax court found that this was irrelevant, but I would respectfully suggest that if you're talking about how do we explain the fact that – and again, it's three times in a 22-day period. The same guy made the same, we argue, error three times in a 22-day period. And no one questioned it. I'm sorry? And no one questioned it. Right, right. No one questioned it. But the question is whether that's enough to prove rigging may depend in part on who has the burden of proof. And it's our position that both under 142 and because of what the tax court said below about the spreadsheets, and I see I'm way out of time, but our position is that the burden of proof on this issue lies squarely with the IRS. And if you look at it through that lens, the pattern, the so-called pattern of three, is not enough to get you there. Again, I see I'm well over my time, so I'll – No, we've been asking you questions and we've had this kind of interference. Why don't we hear from the IRS and we'll give you some time on your boat. Thank you, Your Honor. Thank you. Good morning. Good morning, and may it please the Court. I'm Francesca Ugolini, Counsel for the Commissioner of Internal Revenue. I'd like to address this paragraph of the tax court's opinion that's on page 1940. But before I break down the sentence that, Judge Williams, you have been taking a close look at, I want to place it a little better in context. At this point of the tax court's opinion, it has already cited the evidence that it relied on to find that the parties had agreed to use seven-day forward rates in the transaction. It had cited the Deutsche Bank spreadsheets for all three trades that explicitly listed the forward exchange rate, and those spreadsheets were shared with Bricolage. The Court cited the undisputed fact that the transactions actually unfolded this way, that there was zero foreign currency gain or loss, and that that was totally undisputed, and that that happened every single time. The Court had then turned to, what was the partnership's explanation for this? And Andrew Beer, who was the partnership's only witness, testified at the trial that this was just a mistake, that we relied on Deutsche Bank, and we didn't pay close attention to what they were doing, and they used the wrong rates. And the reason our books and records also show zero profit and loss is because our junior employees made mistakes. And, in fact, no one discovered this, he testified at the trial, until they were preparing for this case. So in response to that testimony, the tax court says, I find him not credible, and I find his testimony self-serving. So the Court has already rejected the partnership's explanation. The Court then... The phrase, every time it closed the Delta options trade, counsel is correct that that's three times. It is not three times. In 2001, there were three trade dates. There was November 26th, December 7th, and December 18th. On each of those days, there were two blocks of trades, and each block involved two options trades. So there were actually 12 trades in 2001. Three sets of... There were 12 trades on three occasions. Correct. 12 trades on three occasions. There also, there is evidence in the record regarding the 2,000 trades that the enrolled funds engaged in. Our expert witness looked at data regarding the 2,000 trades, and he addressed this in his expert report, which begins at page 181 of the joint appendix, and he addressed it at trial. And the page in the appendix that deals with that is 2358. Now, we agree that the economic substance of the 2,000 trades is not at issue in this case. The tax court allowed evidence regarding the history of these transactions as part of the sort of factual narrative and the lead-up to the events in this case. But the court was correct in noting that in 2000, the partnerships also booked zero gain and loss on similar trades. So this undermined the partnership's theory that they cared a great deal about creating, about generating an economic profit in this transaction. And that was ultimately what they had to prove, that the transaction had objective economic substance because they were out to make money. They never disputed that the actual offsetting options, which were denominated in the total amount, was hundreds of millions of dollars. There was absolutely no possibility of making a profit on these offsetting option trades. The only element, according to them, where there was any ability to make a profit was in the way the Deutsche Bank loans were repaid. And they say that this was critical to the transaction passing muster for tax purposes, and yet every time in 2000 and 2001, zero profit was generated upon the repayment, and they never noticed. No one noticed until this case. The tax court looked at the totality of the evidence, the lack of a credible explanation from the partnerships, and then at this portion of the tax court's opinion, the court notes that there's nothing corroborating Andrew Beer's testimony. The partnerships chose not to call the Deutsche Bank witnesses. If I were to disagree with you on that, I'm not saying I – well, this is a hypothetical. If I were to disagree with you on that and to agree with your friend that there was an improper adverse inference drawn here, what then? How am I supposed to think about this case then? Under this court's case law, if the court improperly drew an adverse inference, then it would not matter ultimately unless the court found that it substantially affected the outcome. And I think from the tax court's opinion, if you read beginning on the prior page, J.A. 1939, the court goes through the other evidence that supports its finding. In particular, the spreadsheet – I guess what I'm getting at is how important is this alleged rigging to the tax court's opinion? To the overall – here, the tax court – the IRS had two theories in this case. The first was that even aside from the agreement to use forward rates, there was not a reasonable possibility of profit sufficient to imbue the transaction with economic substance because even under the partnerships theory, they only stood to make at best tens of thousands of dollars on these foreign currency transactions in a context where they're claiming $144 million of tax losses. So that was the primary argument. But the tax court does not rest its conclusion on that argument, right? That's right. It didn't ultimately rest its conclusion on that argument. So that's never been judicially tested? It hasn't, but we submit that that's actually a legal – if this court decided not to address the fact finding on which the court ultimately rested its conclusion, we think this court could reach the IRS's alternative argument regarding reasonable possibility of a profit because it's really a legal argument. Under this court's opinion in ASA Investorings, that was looking at a sham partnership and looking at business purpose. And one of the elements that the court addressed in affirming the tax court's determination that there was no business purpose in that case was that there was only de minimis risk. And the court quoted the Supreme Court's case law dealing with economic substance, which states that the risk – the gain or loss must appreciably affect the taxpayer's interest. Doesn't this argument, in terms of normal circumstances, I think might be very persuasive, run into the IRS's comment that without the rigging there would have been tremendous risk? I'd like to address that point. That is not – that was not the substance of the – of that statement. The tremendous risk statement originated with the IRS's expert's testimony at trial. And admittedly, the way the IRS characterized that testimony in its post-trial brief is lacking in nuance, so it doesn't accurately capture what the expert said. The expert was actually talking about Deutsche Bank's credit risk as to a certain hypothetical that was posed by the Partnerships Council regarding repayment. And the expert was not commenting on the actual risk that the partnerships bore on foreign currency gain or loss. The expert was talking about credit risk to Deutsche Bank. And in our post-trial brief, we continued to argue – and this is at pages 1491, 1494, and 1502 of the joint appendix – that any foreign currency risk that was associated with the loan repayment was minimal and insufficient as a matter of law to establish reasonable possibility of profit. So we never made this concession about tremendous risk. And in fact, the partnerships theory of the case throughout, in their post-trial brief and in counsel's closing argument, was that even a dollar profit was sufficient under the law to imbue the transaction with economic substance. They conceded that the amount of profit that was possible in the case was in the tens of thousands. Andrew Veer testified to this at page 2580 of the joint appendix. So it was never their argument that there was tremendous risk, and we never made that concession. How do you respond to your friend's point that de-pegging is not – there's not an infinitesimally small risk of de-pegging here? I have a few points to make on that. First of all, under the case law, there needs to be a reasonable possibility of profit. And the possibility of buying a winning Powerball ticket or the infinitesimal chance of a de-peg is not a reasonable possibility of profit. But also, the tax court made a finding in its opinion that that did not provide a basis for the transaction to have economic substance. And the partnerships have not challenged that finding in their briefs as clearly erroneous. That came up in the reply brief as sort of a throwaway. But actually, in the closing pages of their reply brief, they make clear that what they're really hanging their hat on is the ability to make a few thousand dollars on the foreign currency exchange. They're not even relying on the de-peg in their briefs. Unless this court has further questions, I would just ask that you affirm the decision of the tax court. Thank you. I want to address a couple of things that my friend said in her argument. I'm sorry? I just identified. Oh, I apologize. I apologize. First of all, she mentioned the IRS's expert witness. I want to be quite clear that the IRS's expert witness assumed the rates were rigged. And on cross-examination, and I remember this very clearly because I was the one who did the cross-examination, he conceded that when he was hired and asked to give his expert report, the IRS did not even tell him that the question of whether or not the rates were rigged was subject to dispute. So under the rules of evidence, a party tendering an expert has the obligation to prove with evidence the assumptions on which the expert's opinion are based. The expert's opinion was based on an assumption of rigging. He did not offer any testimony about whether or not the transactions would have had a reasonable possibility of profit in the absence of rigging. With respect to tremendous risk, I want to read for the Court what the IRS actually said in its brief, and this is a quote, page 1355 of the Joint Appendix. If the euro-krona seven-day forward exchange rate had not been locked in, the FX binary option pair trades would have involved tremendous risk. This risk would have been difficult for Deutsche Bank to hedge. They said that at least twice in their post-trial briefing. Tremendous risk was the word, and that was a proposed finding of fact, and in our post-trial brief, we agreed with it. So basically there was a stipulation between the parties that the transactions would have involved tremendous risk absent rigging, and I would respectfully submit that that's the reason why the tax court didn't reach this question of whether the risk absent rigging would have been. As you read that passage, it seemed to confirm IRS counsel's observation that the risk spoken of by the expert was the risk to Deutsche Bank. But it's a two-party transaction. If there's risk, there's profit potential. What their argument was below was that the transactions must have been rigged because if they weren't rigged, it was a risk that was so tremendous that even Deutsche Bank wouldn't undertake it. The risk to the partnerships was less because their risk was limited to their capitalization. But Deutsche Bank's risk obviously was the whole of Deutsche Bank, and that's the reason why, and there was testimony to this effect, the transactions were less risky for the partnerships because their risk was limited by their capitalization. But that risk, we submit, amounts to profit potential, and it was the IRS's concession that made it so that the court didn't have to reach the question of whether the risk and profit potential that we showed would have been sufficient to constitute economic substance because that was off the table. All he had to decide, all Judge Lauber had to decide, was whether the transactions were rigged or not. And we submit that there was not sufficient evidence to support that conclusion in the absence of the adverse inference that was incorrect as a matter of law. You've been very indulgent with me, so unless the panel has other questions, I'll rest on my brief. Thank you.
judges: Rogers, Griffith, Williams